**BEECHWOOD RESTORATIVE CARE
CENTER, et al., Plaintiffs,**

**v.**

**Laura E. LEEDS, et al., Defendants.**

**No. 02–CV–6235L.**

United States District Court,
W.D. New York.

May 4, 2004.

Kevin S. Cooman, Paul Garrett Barden, Peter J. Weishaar, McConville, Considine, Cooman & Morin, PC, Rochester, NY, for Plaintiffs.

Darren Longo, Office of the New York State Attorney General, Buffalo, NY, Gordon J. Lipson, Underberg & Kessler, LLP, Christopher V. Taffe, U.S. Attorney's Office, Rochester, NY, for Defendants.

## DECISION AND ORDER

LARIMER, District Judge.

Plaintiffs Brook and Olive Chambery ("the Chamberys") commenced this action against various state and federal officials, alleging that defendants, through the deliberate misuse of their regulatory powers, forced a nursing home owned by the Chamberys, Beechwood Restorative Care Center ("Beechwood" or "the facility") to be permanently shut down. Plaintiffs allege that defendants did so to punish the Chamberys for having pointed out problems with respect to defendants' own actions and practices.

Plaintiffs have asserted several claims under 42 U.S.C. § 1983, and a claim against the federal defendants pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). They seek compensatory and punitive damages for the alleged violations of their rights. Defendants have moved for summary judgment dismissing the complaint, and plaintiffs move for summary judgment on the issue of liability as to one of their claims against two of the defendants.

## I. FACTUAL BACKGROUND[1]

### A. Events Leading up to Revocation of Plaintiffs' Operating Certificate

Prior to being shut down, Beechwood was a skilled nursing facility on Culver Road in Rochester, New York, and was operated by the Chamberys as a partnership. Complaint ¶¶ 10, 12, 14. As a

[1.] Although plaintiffs' factual allegations are quite lengthy (their Rule 56.1 Statement, for example, comprises 247 paragraphs spread over 79 pages), they will only be summarized here, and particular or detailed facts will be recited as necessary in the Discussion.

skilled nursing facility, Beechwood held an operating certificate from the New York State Department of Health ("DOH").

As a requirement of its operating certificate, Beechwood became certified as a participant in the Medicare and Medicaid programs ("Medicare/Medicaid").[2] One of the consequences of this was that Beechwood was subject to inspections by DOH to evaluate its compliance with federal and state regulations. Any deficiencies that are found are ranked from "A" (an isolated deficiency causing no actual harm and only the potential for minimal harm to a resident) to "L" (a widespread deficiency causing immediate jeopardy to residents' health or safety).

Plaintiffs allege that DOH generally found few or no violations until 1996, when Brook Chambery[3] began sending what eventually became a "voluminous" series of letters and other papers to DOH and other state officials protesting various aspects of DOH's policies and practices, and advocating a number of changes. Plaintiff's Rule 56.1 Statement ¶ 59. The details of these complaints need not be set forth here, but the gist of them was that certain DOH practices and requirements were illogical, unnecessary, or unduly burdensome.

In November 1996, DOH surveyors conducted their annual review of the facility, and alleged three level "D" deficiencies at Beechwood. (A "D" deficiency is defined as an isolated deficiency with no actual harm, but with the potential for more than minimal harm that would not put residents' health or safety in immediate jeopardy.) Beechwood opposed the deficiency charges, and one of them was later rescinded by DOH. Affidavit of Brook Chambery (Docket # 66) ¶ 63.

A series of deficiency charges followed over the next few weeks, however, along with Chambery's opposition to those charges. Chambery wrote to DOH officials during this time and complained about improprieties and flaws in the survey process. Again, some of the deficiencies were eventually rescinded. Plaintiffs' Rule 56.1 Statement ¶¶ 64–68.

Other problems and conflicts between Beechwood and DOH occurred over the next several years. These included an Article 78 proceeding ("the Langeveld litigation") brought by Beechwood against DOH in late 1996 concerning the proposed discharge of a certain patient (which was resolved by a consent order in March 1997), and a series of letters from Chambery to DOH officials complaining about various matters. In particular, from 1997 through 1999, Chambery wrote and called various DOH officials, arguing for the elimination of Medicaid Access Agreements, which required that, in order to receive state approval for any major changes, the facility had to agree to admit a certain percentage of Medicaid patients. Chambery Aff. ¶ 49.

---

**2.** Medicare is a federally subsidized health insurance program for the elderly and for persons with certain disabilities that is administered by both the Centers for Medicare and Medicaid Services ("CMS") and private contractors. Medicaid is a health care program jointly funded by federal and state sources that provides health insurance and nursing home coverage to low income individuals. It is administered by CMS and by state agencies such as DOH. *United States v. McGovern*, 329 F.3d 247, 248 (1st Cir.2003).

Prior to July 1, 2001, CMS was known as the Health Care Financing Administration ("HCFA"). In order to avoid confusion, "HCFA" will be used throughout this Decision and Order when referring to that agency, regardless of date.

**3.** Since Olive Chambery had relatively little involvement in the underlying events, references to "Chambery" will be understood to refer to Brook Chambery only.

Plaintiffs state that they refused to sign such an agreement, because-due to the low levels of Medicaid reimbursement-it would have imposed a severe economic hardship on Beechwood. As a result, plaintiffs allege, they were unable to expand or make desired changes to Beechwood. At the same time, however, plaintiffs allege that other facilities in the area had signed such agreements and were not complying with them, yet DOH did nothing to enforce those agreements. Therefore, Chambery (who states that he was too conscientious to sign a Medicaid Access Agreement with the intention of not complying with it, *see* Chambery Aff. ¶ 51), engaged in a "multi-year campaign with DOH to either enforce or eliminate this [Medicaid Access Agreement] requirement ...." Chambery Aff. ¶ 53.

Plaintiffs allege that due to Chambery's activities in this regard, DOH officials developed a high level of hostility toward Chambery and Beechwood. According to plaintiffs, Chambery was a thorn in DOH's side because he exposed problems with DOH requirements and procedures, and because of the time that DOH officials were forced to spend in order to address Chambery's complaints.

As a result, plaintiffs allege, DOH stepped up its deficiency charges against Beechwood. Chambery, frustrated with DOH, complained to HCFA about DOH's conduct and asked HCFA to conduct an investigation. Plaintiffs' Rule 56.1 Statement ¶ 95(c). Plaintiffs allege that DOH was aware of Chambery's complaints to HCFA, and that this only increased the DOH officials' animosity toward Chambery. More-and more serious-deficiency findings continued during 1998. (Again, some of these would eventually be reduced or rescinded.)

All of these events, however, are only a prelude to what plaintiffs call "the Offensive," which began in the Spring of 1999. According to plaintiffs, this was a multi-pronged effort by all the defendants to force plaintiffs out of the health-care industry altogether, and to cause them financial ruin and public humiliation. Plaintiffs allege that DOH officials' actions included, among other things: enlisting the support of certain HCFA officials; conducting excessive surveys of Beechwood; trumping up charges against Beechwood; revoking Beechwood's operating certificate; and annulling its establishment approval, which in effect meant that the Chamberys could not sell the facility to a different operator.

## B. State Administrative Proceedings

On June 23, 1999, DOH commenced an administrative hearing ["DOH hearing"] seeking to revoke Beechwood's operating certificate. At the hearing, which lasted fourteen days, DOH presented evidence to substantiate its claims of deficiencies, and plaintiffs attempted to show that the charges were false.[4]

Following the conclusion of the hearing, the administrative law judge ("ALJ") issued a 97–page report finding that DOH had proven most of the charges against Beechwood by a preponderance of the evidence. It is unnecessary here to summarize each of his findings, but a sample of some of the ALJ's findings will indicate the nature of the problems that he found existed at Beechwood.

The ALJ found, for example, that certain "residents were neglected by Beechwood in several significant aspects of care," such as failing to notify a resident's physician of significant changes in the resi-

---

4. The transcript of the hearing (which is about 4000 pages long) is attached as Exhibits B and C to the Affidavit of Charles Steinman (Docket # 73).

dent's condition. *See* ALJ's decision (Affidavit of Anna Colello (Docket # 53) Ex. A) at 66–67. In one instance, the ALJ found that Beechwood had failed to timely notify a resident's physician regarding a "potentially serious or life threatening illness ...." *Id.* at 68. With respect to another resident, the ALJ found that Beechwood had failed to fulfill its obligation to provide appropriate care and monitoring, and that "the record [wa]s devoid of documentation as to the last 5 hours of the resident's life ...." *Id.* at 67.[5]

The ALJ found that Beechwood failed to take adequate measures to prevent or treat some residents' pressure sores. *Id.* at 71–72. He found that one resident has been "subjected, without any reasonable explanation, to an indwelling catheter in place for almost 9 days instead of Beechwood following a physician order of 3 to 4 days." *Id.* at 76. With respect to certain residents who were at risk of falling, the ALJ also found that Beechwood had failed to meet its obligation to take sufficient steps to try to prevent injury to the residents. *Id.* at 74. He also found that "a number of Beechwood residents were not provided adequate pain control," and that in several instances various physicians' orders were not carried out. *Id.* at 78.

The ALJ also found that DOH "took numerous steps in its attempt to keep Beechwood open," and that Beechwood failed to take advantage of the opportunities given it by DOH to rectify the problems with the facility. *Id.* at 65. Instead, he stated, plaintiffs' "plans of correction" submitted to DOH consisted in large part of "denials of events that were found, attacks on the messengers (surveyors) and a barrage of information not relevant or consequential to the cited deficiencies." *Id.* at

90. In fact, the ALJ found, "no correction was taking place." *Id.*

Although the ALJ found a number of specific deficiencies, he also concluded that "[t]he major problem, however, lies in Beechwood's management philosophy which appears to be more interested in arguing and fighting all attempts for compliance than at actually correcting deficiencies." *Id.* at 91. As the ALJ put it, "the combat should have occurred AFTER substantial compliance had been obtained." *Id.* at 66.

In his report, the ALJ also stated that he "found Beechwood's claims of a conspiracy against it and/or Mr. Chambery to be a total, complete, and ridiculous fabrication without a shred of evidence or support." *Id.* at 55. He stated that he "did not perceive any bias or ill will from the Department [of Health] witnesses against Beechwood, its' [sic] employees or owners." *Id.* With regard to certain "internal E-mails, memos and other communications between Department employees," the ALJ stated, "I cannot see the sinister motives the Mr. Brook Chambery seems to attach to everyone [sic] of them.... Mr. Chambery attempts to allege poisonous motives where none exists." *Id.* at 64. The ALJ concluded that "there [wa]s nothing in the record which indicate[d] to [him] that the actions taken and/or conduct of the Department was motivated by or taken in retaliation for Brook Chambery's exercise of any of his rights." *Id.*

Based on his deficiency findings, the ALJ recommended that Beechwood's operating certificate be revoked, and that a civil penalty of $54,000 be assessed. *Id.* at 92. Based upon the ALJ's report and recommendations, DOH in turn issued an

---

5. The ALJ described this resident as a "comfort care" resident, presumably meaning that the care provided to her was intended simply to make her relatively comfortable during her final days.

order revoking Beechwood's operating certificate, and imposing a $54,000 penalty, on December 23, 1999. Colello Aff. Ex. B. Plaintiffs allege that DOH also refused to allow them to sell Beechwood's operating certificate or their establishment approval [6] unless plaintiffs agreed to certain conditions, including releasing all the DOH defendants from liability for their actions, and agreeing that Chambery would never again take a management or ownership position in the health care field in New York.

In addition, in a letter to plaintiffs' counsel dated February 2, 2000, defendant Henry M. Greenberg, DOH's general counsel, stated, in response to plaintiffs' prior inquiry concerning whether and under what conditions plaintiffs could transfer Beechwood to a third party, that "since the operating certificate of Beechwood has been revoked and the facility closed, Beechwood no longer is considered an existing resource of residential health care facility ('RHCF') beds and there is no 'certificate of need or establishment approval' to be transferred." Plaintiffs' App. vol. II at M002049. Greenberg stated that any potential buyer of the facility's land, building and equipment who wished to use the property as an RHCF would be required to submit a certificate of need ("CON") application to DOH, but that in general, DOH was "not reviewing and acting on new CON applications for additional RHCF beds in the state at th[at] time." *Id.* at M002050. According to plaintiffs, this had the effect not only of prohibiting plaintiffs themselves from operating the facility, but also of making it impossible for *anyone* to do so, thereby rendering the facility almost worthless. Plaintiffs contend that this was contrary to New York statutes and regulations.

On February 28, 2000, plaintiffs filed an Article 78 petition in New York State Supreme Court, Monroe County, seeking, *inter alia,* a declaration that the DOH administrative proceeding, the ALJ's report, and the DOH's December 23 order were null and void, for a number of reasons. The petition alleged in part that "DOH's misconduct was in retaliation against and to penalize Petitioners for their exercise of constitutional rights in vigorously advocating for improvements in the nursing home industry and regulatory system over the last three years." Steinman Aff. Ex. A ¶ 26.

On May 15, 2000, Justice Francis A. Affronti issued a decision finding that plaintiffs' petition "raise[d] a question relative to the sufficiency of the evidence at the [DOH] hearing ...," which required that the Article 78 proceeding be transferred to the appellate division under C.P.L.R. § 7804(g).[7] Following that ruling, however, the proceeding seems to have stalled. At oral argument in this

---

**6.** In New York, "[t]wo separate authorizations are ... prerequisites for the operation of a nursing home-a grant of 'establishment' from the Public Health Council, in effect giving the medical facility the right to exist, and an operating certificate from the Commissioner of Health authorizing an identified person, partnership or corporation to operate the facility." *Spiegel v. Whalen,* 44 N.Y.2d 745, 746–47, 405 N.Y.S.2d 679, 376 N.E.2d 1323 (1978). *See also* N.Y. Pub. Health L. §§ 2801–a (dealing with establishment approval), and 2806(5) (dealing with operating certificate).

**7.** Section 7804(g) provides that where an issue is raised concerning whether a determination made as a result of an administrative evidentiary hearing is supported by substantial evidence, the Article 78 proceeding must be transferred for disposition to a term of the appellate division, unless the court in which the petition was filed can terminate the proceeding by ruling on other objections to the proceeding, such as lack of jurisdiction, statute of limitations and res judicata, without reaching the substantial evidence issue.

action, plaintiffs' counsel indicated that, through inaction or error by the Monroe County Clerk's office, or for other unknown reasons, the proceeding never actually got transferred to the appellate division.

Plaintiffs candidly admit, however, that they had "no incentive to press the Article 78" proceeding, Plaintiff's Memorandum of Law at 71, so they simply ceased prosecuting it. That lack of incentive, plaintiffs state, arose partly from the fact that Beechwood had already been closed, and, since damages are not available in an Article 78 proceeding, a favorable outcome in that proceeding would have been a Pyrrhic victory. Plaintiff's counsel also conceded at oral argument, however, that plaintiffs were concerned that if the Article 78 proceeding were prosecuted to its conclusion, the state court's rulings on the issues presented in the Article 78 petition might be given collateral estoppel effect in any later actions initiated by plaintiffs, such as the instant lawsuit. Counsel stated that this was a concern in part because plaintiffs would not have had the same opportunities for discovery in the Article 78 proceeding that they do in this action, and because plaintiffs could not have raised in that proceeding the full range of constitutional claims that they do here. *See also* Plaintiff's Memorandum of Law at 72 (noting that plaintiffs "chose not to press for an adjudication" in the Article 78 proceeding due to the risk of a "premature adjudication" of plaintiffs' constitutional claims).

## C. Federal Administrative Proceedings

Contemporaneously with the state administrative proceedings, events concerning Beechwood were taking place at the federal administrative level as well. In a letter to Olive Chambery dated June 29, 1999, HCFA informed her that it had terminated Beechwood's Medicare and Medicaid provider agreement effective June 17, 1999. Plaintiffs' App. vol. II, at M001281.

The letter stated that this decision was based on DOH's determination that the facility had not achieved substantial compliance with federal requirements.

Beechwood then requested a federal administrative hearing to challenge the termination and the findings on which it was based. An ALJ held a hearing on April 3 and 17, 2001, and issued a decision in which he concluded that Beechwood was not in substantial compliance as of DOH's May and June 1999 surveys. Prior to the hearing, the ALJ also ruled, *inter alia,* that he lacked authority to hear and decide Beechwood's challenges both to the actions taken against it by DOH, and to the constitutionality of those actions. Ultimately, however, he did sustain HCFA's determination to terminate Beechwood.

Beechwood appealed the ALJ's decision to the Department of Health and Human Service's Departmental Appeals Board ("DAB"), alleging various prejudicial errors by the ALJ. Without reaching the merits of whether Beechwood was in substantial compliance at the time of the relevant surveys, the Board reversed and remanded the case to the ALJ for further proceedings, including a new decision. In so doing, the DAB instructed the ALJ regarding a number of procedural matters concerning which it found that the ALJ had erred.

On remand, the ALJ made certain additional findings and rulings, but again upheld HCFA's termination of Beechwood. Beechwood again appealed to the DAB, which held that the ALJ's findings of fact and conclusions of law in both of his decisions should be sustained except as to two specific examples regarding individual residents. *See Beechwood Sanitarium v. Centers for Medicare & Medicaid Services,* DAB No.1906, 2004 HHSDAB LEXIS 3 (H.H.S. Jan. 23, 2004). The DAB added that since its reversal of the ALJ's

findings regarding those two allegations did not affect the outcome of its evaluation of the deficiency findings to which the allegations were directed, the DAB declined Beechwood's request that it override the ALJ's findings and conclusions sustaining deficiencies found in DOH's surveys. 2004 HHSDAB LEXIS 3, at *240. The DAB further declined Beechwood's request that it remand to the ALJ to consider additional deficiency findings from those surveys which he had found unnecessary to address. The DAB stated that "[i]n the context of this case and the findings which [the DAB] ha[d] sustained, any outcome of any further review of findings not already evaluated could not alter the clear evidence of noncompliance of a kind more than adequate to support the imposition of the appealed remedies." *Id.* at *240–41. The DAB concluded that the ALJ did not err in concluding that HCFA had the authority to impose the remedies appealed by Beechwood.

### D. Actions in this Court

On June 8, 1999, while the state administrative charges were pending against Beechwood, plaintiffs filed an action in this Court seeking to enjoin DOH from taking further action to revoke their operating certificate. The Court denied plaintiffs' request for a temporary restraining order on June 17, 1999, on the grounds of both *Younger* abstention, *see Younger v. Harris*, 401 U.S. 37, 47–53, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and because plaintiffs had not exhausted their administrative remedies. *See* Transcript, *Beechwood v. Leeds* ("*Beechwood I*"), 99–CV–6235 (Ex. A to Affidavit of Darren Longo (Docket # 57 in the instant action)). That action was ultimately dismissed by stipulation of the parties in August 1999.

In 2002, however, while the federal administrative proceedings were continuing, plaintiffs commenced the instant action. The complaint names seventeen DOH defendants and two federal defendants. The complaint asserts: (1) a § 1983 claim for denial of procedural due process, based on DOH's annulment of Beechwood's establishment approval; (2) a § 1983 claim for First Amendment retaliation; (3) a § 1983 claim for denial of equal protection; (4) a § 1983 claim for "abuse of governmental power" and denial of substantive due process, *see* Complaint at 75; (5) a § 1983 claim for "denial of [plaintiffs'] right to federal law supremacy," *see* Complaint at 76; and (6) *Bivens* claims against the federal defendants.[8]

In separate motions, the DOH and the federal defendants have moved for summary judgment dismissing the complaint. Plaintiffs have cross-moved for "partial" summary judgment on the issue of liability on their procedural due process claim against two of the DOH defendants, Greenberg and Edmund Altone.

## II. DISCUSSION

### A. Collateral Estoppel

The DOH defendants assert that plaintiffs are barred from raising most, if not all, of their claims under the doctrine of collateral estoppel. Collateral estoppel, also known as issue preclusion, "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir.1999) (quoting *Schiro v. Farley*, 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994)). Defendants contend that plaintiffs should be precluded

---

**8.** A seventh claim under § 1983 for denial of various rights under federal law has been withdrawn by plaintiffs.

from relitigating in this action the issues that the DOH ALJ decided in his 97–page report.

■ A "federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered" pursuant to both the United States Constitution and the Full Faith and Credit Act, 28 U.S.C. § 1738. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *accord Leather*, 180 F.3d at 424. The same is true of decisions by state agencies. "[W]hen a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate ... federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *University of Tennessee v. Elliott*, 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (internal punctuation and quotation marks omitted). *See also Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 728 (2d Cir.2001) ("in § 1983 actions, the factual determinations of a state administrative agency, acting in a judicial capacity, are entitled to the same issue and claim preclusive effect in federal court that the agency's determinations would receive in the State's courts") (citing *Elliott*, 478 U.S. at 798–99, 106 S.Ct. 3220)

■ Under New York law, [c]ollateral estoppel, or issue preclusion, gives conclusive effect to an administrative agency's quasi-judicial determination when two basic conditions are met: (1) the issue sought to be precluded is identical to a material issue necessarily decided by the administrative agency in a prior proceeding; and (2) there was a full and fair opportunity to contest this issue in the administrative tribunal. The proponent of collateral estoppel must show identity of the issue, while the opponent must demonstrate the absence of a full and fair opportunity to litigate.

*Jeffreys v. Griffin*, 1 N.Y.3d 34, 39, 769 N.Y.S.2d 184, 801 N.E.2d 404 (2003) (citations omitted). The party opposing the application of estoppel has the burden of proving that it did not have a full and fair opportunity to litigate the claims in question. *Kosakow*, 274 F.3d at 733 (citing *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 501, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984)).

The New York Court of Appeals has also stated that in the context of determinations of administrative agencies, "the doctrine [of collateral estoppel] is applied more flexibly, and additional factors must be considered by the court. These additional requirements are often summed up in the beguilingly simple prerequisite that the administrative decision be 'quasi-judicial' in character." *Allied Chemical, an Operating Unit of Allied Corp. v. Niagara Mohawk Power Corp.*, 72 N.Y.2d 271, 276, 532 N.Y.S.2d 230, 528 N.E.2d 153 (1988) (citations omitted), *cert. denied*, 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989).

■ Plaintiffs contend that this doctrine does not apply here, first, because the ALJ did not (in fact, could not) resolve the identical issues presented in the case at bar. Plaintiffs assert that they could not litigate their constitutional claims in the DOH hearing. Furthermore, plaintiffs argue, even if they could have presented their constitutional claims before the ALJ, he lacked jurisdiction and authority to pass on them. In support of this assertion, plaintiffs rely on the principle that "[c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures ...." *Califano v. Sanders*, 430 U.S. 99, 109, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *see also Hurlbut v. Whalen*, 58

A.D.2d 311, 317, 396 N.Y.S.2d 518 (4th Dep't 1977) ("the administrative agency lacked both the power and competence to pass on the constitutionality of its own actions and procedures").

 Plaintiffs, however, are blurring the distinction between res judicata, or claim preclusion, and collateral estoppel, or issue preclusion. "Under the doctrine of claim preclusion, [a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 476, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998) (internal quotation marks omitted; alteration in original); *see also Blonder–Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 350, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Collateral estoppel, on the other hand, "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Schiro v. Farley*, 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994) (internal quotation marks omitted).

Although plaintiffs may not have been able to litigate their constitutional *claims* before the ALJ, they could, and did, litigate many of the factual issues upon which those claims are based. That is made clear by the ALJ's report, in which he expressly "found Beechwood's claims of a conspiracy against it and/or Mr. Chambery to be a total, complete, and ridiculous fabrication without a shred of evidence or support," and that "there [wa]s nothing in the record which indicate[d] to [the ALJ] that the actions taken and/or conduct of [DOH] was motivated by or taken in retaliation for Brook Chambery's exercise of any of his rights." *See Parker v. Blauvelt Volunteer Fire Co., Inc.*, 93 N.Y.2d 343, 350, 690 N.Y.S.2d 478, 712 N.E.2d 647 (1999) ("all of the factual issues dispositive of the constitutional claims being raised in the instant [§ 1983] action were necessarily decided in the prior article 78 proceeding").

██ It is also clear that the standards for application of collateral estoppel have been met here. First of all, the DOH proceedings were quasi-judicial in nature. In *Jeffreys v. Griffin*, 1 N.Y.3d 34, 769 N.Y.S.2d 184, 801 N.E.2d 404 (2003), the New York Court of Appeals addressed the issue of whether a finding of sexual misconduct by a disciplinary hearing committee of the DOH's Board for Professional Medical Conduct precluded the defendant physician from contesting liability for assault and battery in the plaintiff patient's civil action to recover money damages. The court stated that such disciplinary hearings "are 'quasi-judicial' in the general sense required for application of the doctrine of collateral estoppel." *Id.* at 42, 769 N.Y.S.2d 184, 801 N.E.2d 404. The court added that "[t]his is so notwithstanding the differences between these proceedings and a civil trial ...: the absence of juries, the absence of CPLR article 31 disclosure and the inapplicability of the rules of evidence followed in a civil trial." *Id.*[9]

**9.** Ultimately, the Court of Appeals held that collateral estoppel did not apply in *Jeffreys*, but only because, when the hearing committee's members voted to revoke the defendant's license, they knew that he had been convicted on criminal charges stemming from the alleged sexual misconduct. Following the committee's findings, however, the defendant's criminal conviction was reversed, and, on retrial he was acquitted of all the criminal charges stemming from the plaintiff's allegations. The *Jeffreys* court stated that "[t]here [wa]s no way to disentangle the Hearing Committee members' nonunanimous determination of sexual misconduct from their contemporaneous awareness of the outcome of defendant's first criminal trial. Because defendant was later acquitted after retrial, he should not be precluded from contesting lia-

Although the DOH hearing in the instant case was not a physician's disciplinary hearing, it too was " 'quasi-judicial' in the general sense required for application of the doctrine of collateral estoppel." Plaintiffs were given notice of the charges against Beechwood, and had the right to present evidence and examine witnesses. The determination of the charges was made by an ALJ with authority to decide the case. *See* N.Y. Pub. Health L. § 2806 (setting forth procedures for revocation of operating certificates); *Allied Chemical,* 72 N.Y.2d at 276–77, 532 N.Y.S.2d 230, 528 N.E.2d 153 (setting forth factors to consider in deciding whether administrative agency's determination is quasi-judicial).

In addition, the factual issues in the instant case relating to whether the charges did in fact have a solid factual basis, or instead were "trumped up" were identical to material issues that were necessarily decided by the ALJ. The primary issue before the ALJ was whether DOH had proven its deficiency charges by a preponderance of the evidence: in other words, whether the evidence indicated that the alleged violations had actually occurred. If the charges were true, then obviously they could not have been spurious or concocted, as plaintiffs contend.

Given the fact that plaintiffs took the position that the charges were unfounded, they had a clear incentive to litigate the truth of DOH's allegations, and they certainly did litigate that issue: enough, in fact, to fill 4000 pages of transcribed testimony. Nor were plaintiffs prevented from attempting to show that the charges were motivated by ill will or some other improper considerations, and that Beechwood was singled out for inspections and deficiency findings, as demonstrated by the following

examples of plaintiffs' counsel's cross-examination of various DOH employees:

Q. You are aware of a long-standing dispute between Mr. Chambery and Mr. Rubin over a number of issues, are you not?

A. I'm not aware of any kind of dispute. I'm not sure what you mean by that.

DOH Hearing Transcript ("Tr.") vol. I (Docket # 73, Ex. B) at 541.

Q. . . . On April 20th, did you not tell Ms. Westbrook [a Beechwood employee] that there has been a problem between Brook Chambery and Sandy Rubin, and that Brook Chambery had sued Sandy and the Department of Health, and that they, the Department of Health and Rubin, were going to get him, meaning Chambery, for it?

A. I was not aware that there was even any kind of suing going on in any— I did not know about that. I did not ever talk to Gwen about that. I didn't know anything like that was going on.

Tr. at 542.

Q. In your judgment, would it be improper for a Department of Health official to resent a facility's use of that [informal dispute resolution ("IDR")] process?

A. We do not resent the use of that process. Absolutely not.

\* \* \* \* \* \*

Q. Do you think it would be improper for a person in your position or Department of Health official to punish a facility for its use of the IDR process?

A. Yes.

---

bility for assault and battery in plaintiff's civil action." *Id.* at 42–43, 769 N.Y.S.2d 184, 801 N.E.2d 404 (footnote omitted). Had the defendant's conviction been affirmed on appeal,

then, it appears likely that the *Jeffreys* court would have held that collateral estoppel did apply.

Q. That would be improper, wouldn't it?

A. Yes, that would be improper.

Q. And so to make it more specific, it would certainly be improper for the Department of Health to resent Beechwood or Mr. Chambery for his use of the process, wouldn't it?

A. We do not resent him for that. We do not.

Tr. at 768–69.

Q. Ms. Baker, do you think it would be proper or improper for the deficiency process to have a predetermined outcome?

A. Improper.

\* \* \* \* \* \*

Q. And wouldn't it also be improper for any Department of Health official to have an outcome in mind before even hearing from the facility?

A. Yes.

Tr. at 771.

Q. Would you agree with me that it would be improper if a Department of Health official said that they were out to get Beechwood?

A. Yes.

Q. So if, for example, Mr. Rubin had said to a nurse at Beechwood, "The reason we are doing this is because your boss, Mr. Chambery, has litigated against the Department and so we're going to get him" -

\* \* \* \* \* \*

Q. that would be improper, would it not, Ms. Baker?

\* \* \* \* \* \*

A. That would be improper.

Q. And if that statement, that same statement about Mr. Chambery were made by one of your surveyors, such as Cindy Francis, that would be entirely improper, wouldn't it?

A. She did not make that statement.

Q. That's not my question. If she made such a statement, it would be entirely improper, would it not?

A. If she made the statement, yes.

Tr. at 772–73.

Q. . . . Did Mr. Rubin also write to you, "And while we view Mr. Chambery as a poor NFO"—I assume nursing facility operator—"we do not underestimate him as an opponent in court. We believe strongly that our ducks are in line. All of our surveyors are together on this."

In fact, that's the statement he wrote to you on 4/27, correct?

A. That refers to our Statement of Deficiencies.

\* \* \* \* \* \*

Q. Well, what was happening here, Ms. Baker, is that you, Mr. Rubin and Ms. Leeds had decided to draw the line, and it didn't matter what Mr. Chambery and the facility said; you were going to see that his license was revoked?

A. Absolutely not. Absolutely not.

Tr. at 779–81.

Q. And isn't it true, Ms. Baker, that these proceedings that you were bringing were solely with the intention to get Mr. Chambery out of the picture at Beechwood?

A. Absolutely not.

Tr. at 797.

Q. And isn't it your understanding that Mr. Rubin was extremely upset that Mr. Chambery was exercising his Stage I review rights?

A. That is not correct.

Q. Was he upset at all?

A. Not that I know of.

Q. Was he even irked a little?

A. Not that I know of.

\* \* \* \* \* \*

Q. And Mr. Rubin at no time after March ever said to you, "Gee, it bugs me that Mr. Chambery exercises his informal dispute resolution rights"?

A. Never.

Q. Never said that to you?

A. Never.

Q. And as far as you know, it doesn't bother Mr. Rubin at all when someone exercises their due process rights? [10]

Q. Does it bother you, Ms. Carlo, when Mr. Chambery exercises his informal dispute resolution rights?

A. No.

Q. And were you aware based on this E-mail [Rubin's "our ducks are in line" e-mail] that Mr. Rubin resented Mr. Chambery opting to contest the findings through IDRs as he states in paragraph 1? [11]

\* \* \* \* \* \*

Q. Did you ever know prior to April 27 that Mr. Rubin objected to Mr. Chambery exercising those rights?

A. No, sir.

Tr. at 1020–21.

Q. To your knowledge, in your 30 years with the Department, this is the first time the Department has tried to decertify a residential care facility?

A. With the exception of the early '70s when there were proceedings related to non-conforming wood frame structures.

Tr. at 1539.

Plaintiffs' counsel also presented the testimony of Gwendolyn Westbrook, a Beechwood staff member, who stated that, when she noticed that the DOH inspections were becoming almost incessant, she said to Cindy Francis, a DOH inspector, "Oh, my God, what is this? Do I have to find another job or what?" Westbrook testified that Francis then leaned over toward her and said, "You know, there are better places to work at than this and if you value your license, you wouldn't work here no longer." Tr. at 2131–32. Westbrook also testified that one day Francis told her, "You know, it's a personal thing." When Westbrook asked Francis what she was talking about, Francis replied, "Between my boss and your boss." Westbrook stated that Francis then "told [her] about a lawsuit [12]," Tr. at 2132–33, and "said they was going to get [Chambery]. There weren't no but. They weren't going to try to get him, they were going to get him." Tr. at 2135.

Chambery himself also testified at the hearing. When asked if there had been a "rocky relationship between [him] and Mr. Rubin," Chambery replied, "There has been for quite a while." When asked why, he stated, "I knew that when we put the Langeveld lawsuit on long ago, three years ago, he was named in that lawsuit." Tr. at 2018. Chambery stated that when he filed the suit naming Rubin as a defendant, Chambery knew that he "was going to have trouble." Tr. at 2019.

Chambery also testified that at an IDR conference in 1998, Rubin said to him, "What are you always doing this for [i.e., requesting IDR conferences]? You are one of the few people that drives it to this point." He stated that "things got very tense" during that conference, and that at one point, Rubin "came out with a statement [that] 'I have serious concerns about the skin care in your facility.'" Chambery said that this surprised him because Beechwood had "always been way under the norm in the number of decubitus [bed

---

10. Plaintiffs' counsel withdrew this question following an objection.

11. The witness's answer was nonresponsive.

12. The lawsuit referred to is presumably the Langeveld litigation.

sore] problems in our facility. And when [Rubin] came out for the exit conference . . ., lo and behold we had a decubitus issue in that Deficiency Report that had never been discussed anywhere up to that date and time." Tr. at 2020. Prompted by his attorney, Chambery also noted that this exit conference occurred on the same date as the date of Rubin's "our ducks are in line" e-mail. Tr. at 2020–21.

To say, then, that plaintiffs were unable to litigate the factual issues of whether the charges were unfounded or brought for a retaliatory motive, whether Beechwood was unfairly singled out, and whether the various DOH officials involved were acting in concert, is flatly contradicted by the record. They could, and did, litigate those issues, at considerable length.

 I also find that plaintiffs have failed to carry their burden of showing that they did not have a full and fair opportunity to litigate these issues in the DOH proceedings. "The analysis [of whether the opponent of issue preclusion had a full and fair opportunity to litigate an issue] requires consideration of 'the realities of litigation,' such as recognition that if the first proceeding involved trivial stakes, it may not have been litigated vigorously." *Staatsburg Water Co. v. Staatsburg Fire Dist.*, 72 N.Y.2d 147, 153, 531 N.Y.S.2d 876, 527 N.E.2d 754 (1988) (citing *Gilberg v. Barbieri*, 53 N.Y.2d 285, 292, 441 N.Y.S.2d 49, 423 N.E.2d 807 (1981), and *Schwartz v. Public Adm'r*, 24 N.Y.2d 65, 72, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969)). "In the end, the fundamental inquiry is whether relitigation should be permitted in a particular case in light of what are often competing policy considerations, including fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results." *Staatsburg*, 72 N.Y.2d at 147, 531 N.Y.S.2d 876, 527 N.E.2d 754.

Plaintiffs contend that they lacked a full and fair opportunity to litigate these issues in the DOH hearing because they had insufficient time to prepare for the hearing and inadequate discovery, and because eleven of the nineteen defendants in this action were not called as witnesses at the hearing (meaning that plaintiffs have never had an opportunity to examine them under oath). In addition, plaintiffs note that they were not the ones who chose the forum, and they allege that the ALJ himself was biased, and sought to "whitewash" the conduct of the DOH officials. According to plaintiffs, by the time of the hearing, "the fix was in." Plaintiff's Memorandum of Law at 69.

 Plaintiffs' contention that the ALJ was biased is entirely conclusory and speculative. The fact that he was employed by DOH is not enough in itself to show that his decision was predetermined. "That ALJs and investigators are employed by the same agency, without more, is insufficient as a matter of law to raise an inference of bias." *Stone v. City of New York*, 240 A.D.2d 216, 216, 658 N.Y.S.2d 589 (1st Dep't 1997) (citing *Matter of Children of Bedford v. Petromelis*, 77 N.Y.2d 713, 723–724, 570 N.Y.S.2d 453, 573 N.E.2d 541, *vacated on other grounds*, 502 U.S. 1025, 112 S.Ct. 859, 116 L.Ed.2d 767 (1992)). If it were, then adjudicative determinations of administrative agencies concerning charges brought by the agencies' investigators could almost never be given preclusive effect, which is clearly not the law in New York.

In addition, although the DOH hearing may not have afforded plaintiffs the full panoply of procedures that are available to litigants in a civil action, *Jeffreys* makes clear that this fact alone does not make collateral estoppel inapplicable. *See Jeffreys*, 1 N.Y.3d at 42, 769 N.Y.S.2d 184, 801 N.E.2d 404 (administrative hearing

was quasi-judicial "notwithstanding the differences between these proceedings and a civil trial"). The hearing was anything but perfunctory in nature, and the transcript makes plain that plaintiffs were able not only to cross-examine DOH's witnesses but introduce a great deal of evidence of their own. *See Bonheur v. Dresdner Bank, A.G.*, No. 85 CIV. 4925, 1986 WL 4702, at *5 (S.D.N.Y. April 14, 1986) (administrative hearing gave the plaintiff a full and fair opportunity to litigate the issue of his misconduct, since: that issue "was at the heart of the administrative hearing and was far more than 'briefly explored' at that hearing"; plaintiff was represented by counsel at hearing; possibility of future litigation was clearly foreseeable; proceeding "was a sufficiently extensive and fully adversarial hearing presided over by an Administrative Law Judge"). Plaintiffs have also not shown how additional discovery would have altered the outcome of the hearing.

■ Although courts do consider whether it was the proponent or opponent of collateral estoppel that chose the forum whose findings are sought to be given preclusive effect, *see, e.g., Gilberg v. Barbieri*, 53 N.Y.2d 285, 293, 441 N.Y.S.2d 49, 423 N.E.2d 807 (1981), it is not a dispositive factor. *See, e.g., Kanat v. Ochsner*, 301 A.D.2d 456, 458, 755 N.Y.S.2d 371 (1st Dep't 2003) (applying collateral estoppel against defendants based on findings made in prior action in which they were also defendants); *Pahl v. Grenier*, 279 A.D.2d 882, 883, 719 N.Y.S.2d 370 (3d Dep't 2001) (defendant in civil action was estopped from relitigating issue of his negligence, since jury in criminal trial had found him guilty of reckless assault). Rather, New York courts have emphasized that collateral estoppel is a flexible doctrine that should not be applied mechanically, particularly when administrative agency determinations are involved. *See Jeffreys*, 1 N.Y.3d at 40–41, 769 N.Y.S.2d 184, 801

N.E.2d 404; *O'Gorman v. Journal News Westchester*, 2 A.D.3d 815, 770 N.Y.S.2d 121, 123 (2d Dep't 2003).

The court in *Jeffreys* held that the hearing committee's findings in that case should not be given preclusive effect, not because the defendant physician had not chosen the Board for Professional Medical Conduct as a forum in which to litigate his alleged misconduct, but because the committee's findings were made before the reversal of the defendant's criminal conviction and his subsequent acquittal on retrial. In fact, that court observed that "when the physician loses in the Hearing Committee, assuming a full and fair opportunity to contest the identical issue, the physician has, indeed, had a day in court." 1 N.Y.3d at 42, 769 N.Y.S.2d 184, 801 N.E.2d 404.

The same is true here. Although plaintiffs may not have chosen the DOH administrative forum, they did have a full and fair opportunity to litigate the issues of whether Beechwood was deficient in some respects, and whether the charged deficiencies were brought in good faith, or were instead trumped-up or motivated by retaliation. Plaintiffs, then, did have "a day in court."

### Article 78 Proceeding

■ It should also be noted that plaintiffs themselves chose not to make full use of the procedures that *were* available to them. They could have, and in fact did, commence an Article 78 proceeding to review the outcome of the DOH hearing, but by their own admission, plaintiffs chose not to pursue it. Even if plaintiffs believed that the result of the DOH hearing had been preordained, they had no reason to think, nor do they now contend, that the same would have been true of the Article 78 proceeding. Although this may not bar them from bringing a § 1983 action in this Court, plaintiffs can hardly be heard to

complain that they were not given a full and fair opportunity to contest the issues here when they did not fully avail themselves of the opportunities that *were* open to them.[13] For collateral estoppel to apply, all that is required is a full and fair *opportunity* to litigate the issues in question. A party cannot deliberately choose not to fully litigate those issues, and then argue that estoppel is inapplicable simply because he failed to take advantage of that opportunity.

■ I also note that, while plaintiffs may not have been able to seek damages in the Article 78 proceeding, they certainly could have raised their constitutional claims there. *See, e.g.*, 93 N.Y.2d at 349–50, 690 N.Y.S.2d 478, 712 N.E.2d 647 (discussing preclusive effect, in action under § 1983, of lower court's rulings on plaintiff's constitutional claims in prior Article 78 proceeding); *see also Moccio v. New York State Office of Court Admin.*, 95 F.3d 195 (2d Cir.1996) ("Although Moccio contends that he never raised these precise constitutional claims in the Article 78 proceeding . . . , it cannot be doubted that he could have raised these federal constitutional claims in that proceeding").

In addition, based on the Court's recollection and review of its own and the court reporter's notes, plaintiffs' counsel at oral argument made the assertion that the New York Court of Appeals' decision in *Parker* makes clear that it was perilous for plaintiffs to proceed with the Article 78 proceeding because they would not have had a full and fair opportunity to litigate their constitutional claims. In fact, *Parker* held that the

> plaintiff ha[d] failed to meet his burden of establishing that he lacked a full and fair opportunity in the prior [Article 78] proceeding to litigate the foregoing [constitutional] issues and thereby avoid the preclusive effect of an adverse determination of those issues. *Nothing prevented him from fully litigating the constitutional grounds he advanced* for invalidating the disciplinary determination against him.

93 N.Y.2d at 350, 690 N.Y.S.2d 478, 712 N.E.2d 647 (emphasis added).[14]

Plaintiffs' argument that they had no opportunity to litigate constitutional claims before the ALJ therefore rings hollow in light of the fact that they could have asserted, and in fact did assert, such claims in their Article 78 proceeding. Plaintiffs' Article 78 petition alleged, *inter alia*, that: the DOH proceeding "was impermissibly selective, punitive, retaliatory and unlawful," and "DOH's conduct toward Beechwood was in retaliation for Petitioners' exercise of their constitutional rights under the First and Fourteenth Amendments . . . ," Steinman Aff. Ex. A ¶¶ 167, 168; and

---

13. Plaintiffs also contend that some of their claims arise from events that occurred outside of or subsequent to the DOH hearing, and that the fact of the hearing itself gives rise to their "federal supremacy" claim, because they contend that DOH should have allowed a federal administrative proceeding to take place before commencing its own hearing. Any claims raised by plaintiffs that could not have been, and were not, heard and decided upon in the DOH hearing process will be addressed below.

14. I also note that, had plaintiffs fully litigated their constitutional claims in the state courts, this Court might lack jurisdiction over those claims by virtue of the *Rooker–Feldman* doctrine. *See, e.g., Moccio,* 95 F.3d at 200–02 (*Rooker–Feldman* barred all of plaintiff's causes of action because the issues raised by plaintiff in his federal action challenging his termination were previously decided by the state court in his Article 78 proceeding); *but see DiBlasio v. Novello,* 344 F.3d 292, 296 (2d Cir.2003) (*Rooker–Feldman* did not bar plaintiff's due process claims, since it was not comparable to his Article 78 claim), *cert. denied,* —— U.S. ——, 124 S.Ct. 2018, 158 L.Ed.2d 492 (2004).

"Petitioners were denied fundamental due process during the DOH Administrative Proceeding ...," *id.* ¶ 184. Plaintiffs also raised their "federal primacy" claim that it was improper for DOH to conduct a hearing prior to the completion of the federal administrative proceeding. *Id.* ¶¶ 170–77.

There is also a suggestion in plaintiffs' papers that they could not have obtained adequate discovery in an Article 78 proceeding. Parties to an Article 78 proceeding can obtain discovery with leave of court, however. *Town of Pleasant Valley v. New York State Bd. of Real Property Services*, 253 A.D.2d 8, 15, 685 N.Y.S.2d 74 (2d Dep't 1999). Furthermore, C.P.L.R. § 7804(h) provides that, where a proceeding was transferred to the appellate division, and a triable issue of fact has been raised in the proceeding, "the issue of fact shall be tried by a referee or by a justice of the supreme court and the verdict, report or decision rendered after the trial shall be returned to, and the order thereon made by, the appellate division." Therefore, I do not accept plaintiffs' assertion that the transfer of their Article 78 proceeding to the appellate division somehow rendered that proceeding inadequate for resolution of their claims.

### Federal Administrative Review

Plaintiffs also argue that the ALJ's findings cannot be given preclusive effect because they differ in some respects from the findings made in the federal administrative process. Specifically, with respect to a few of the alleged deficiencies, the federal and DOH ALJs reached differing conclusions about whether the deficiencies had been proven. *See* Plaintiffs' "Decision Comparison Chart," Plaintiffs' App. vol. I, at M002915–27. In addition, the final decision of the DAB in the federal administrative proceedings reversed the federal ALJ's findings in two respects. 2004 HHSDAB LEXIS 3, at *118, 174.[15]

Importantly, however, the DOH and federal ALJs, as well as the DAB, all concluded that Beechwood was sufficiently in violation of the application regulations to justify the penalties imposed on Beechwood. Thus, even if the Court were to ignore any findings where the state and federal administrative authorities reached different conclusions, there are still many factual findings concerning Beechwood's violations as to which the state and federal authorities did not disagree.[16]

Furthermore, it appears that the DOH hearing was more extensive and comprehensive than the federal hearing. The federal hearing took two days, as opposed to fourteen for the DOH hearing. Some of the evidence presented to the federal ALJ consisted of excerpts from the transcript of the DOH hearing. There were also many alleged deficiencies which the DOH ALJ made findings on that the federal ALJ made no determination on. Therefore, I see no reason why the ALJ's and DAB's decisions in the federal administrative process should prevent the DOH's factual finding that there were deficiencies at Beechwood serious enough to warrant revocation of its operating certificate from being given preclusive effect.

---

**15.** As to one of those findings, however, the DAB, though reversing one of the ALJ's findings with respect to a particular resident, added, "We expressly conclude, nevertheless, that the other ALJ findings under this tag, which we have concluded are supported by substantial evidence in the record, are more than sufficient to demonstrate that Beechwood was not in substantial compliance with the regulatory requirement cited." 2004 HHSDAB LEXIS 3, at *118–19.

**16.** These include violations which both the state and federal authorities agreed upon; violations that were found by the DOH ALJ, but not ruled upon by the federal ALJ; and violations that were found by the federal ALJ, but not ruled upon by the DOH ALJ.

### Collateral Estoppel Precedent in Second Circuit

I also note that my ruling on the collateral estoppel issue finds support in another district court case from within this circuit, *Daxor Corp. v. Linden*, No. 95 Civ. 7847, 1998 WL 108023, 1998 U.S. Dist. LEXIS 2819 (S.D.N.Y. Mar. 10, 1998). In *Daxor*, the plaintiffs (a corporation and its president and majority shareholder) operated a publicly licensed blood bank, sperm bank and clinical laboratory. They brought an action against various defendants, alleging that state and municipal officials conspired with private individuals in the blood banking industry, to harass the corporation and put it out of business, because the corporation posed a threat to more established blood banks, and because the individual plaintiff had made comments critical of the blood banking industry's safety standards.

The district court granted the defendants' motion for summary judgment on the ground of collateral estoppel, because the plaintiffs' allegations had already been litigated on the state level. In particular, the court noted, the corporate subsidiary that operated the blood bank ("Idant") had commenced two Article 78 proceedings, challenging certain actions by DOH. Idant's claims were rejected in both actions. In the first, a state supreme court judge found "no legitimate claims of abuse of discretion," and in the second, the court-rejecting Idant's claim of bias on DOH's part-ruled that there was no evidence of bad faith or improper motives behind DOH's actions. *See id.*, 1998 WL 108023, at *2, 1998 U.S. Dist. LEXIS 2819, at *5. Idant appealed both of these decisions-the latter unsuccessfully up to the New York Court of Appeals. *See Daxor v. N.Y. State Dep't of Health*, 90 N.Y.2d 89, 659 N.Y.S.2d 189, 681 N.E.2d 356 (1997). In ruling against Idant, the court again found that Idant's claims of bias were without merit. *See id.* at 101, 659 N.Y.S.2d 189, 681 N.E.2d 356.

Similarly, DOH's allegations concerning the plaintiffs' sperm bank operation had been the subject of an administrative trial (which, coincidentally, also lasted fourteen days), at the conclusion of which the ALJ found that Idant had committed certain violations. Again, Idant raised the issue of bias and selective enforcement, and again those claims were rejected by the ALJ, who found no evidence of a "hidden agenda" on the part of DOH officials. 1998 WL 108023, at *3, 1998 U.S. Dist. LEXIS 2819, at *6.[17]

The plaintiffs in *Daxor* then brought an action in federal court, asserting claims under § 1983 and other statutes. In its decision granting the defendants' motion for summary judgment, the district court stated that there were

> two "decisive" issues that were necessarily decided in previous State court and administrative actions. The first is that Idant was not entitled to operate its blood bank, semen bank and clinical laboratory because of its repeated violations of State and City regulations. The second is that the Defendants were not involved in a "regulatory conspiracy" to deprive Idant of necessary licenses in order to favor not-for-profit blood banks. Because these allegations are essential elements of all the causes of action alleged by Plaintiffs, all of Plaintiffs' claims must fail.

*Id.* at 1998 WL 108023, *5, 1998 U.S. Dist. LEXIS 2819, *15. The court added that "DOH's repeated findings of violations, as well as its concerns about Idant's 'character and competence,' were necessarily de-

---

**17.** Idant also engaged in various litigation over these and similar matters with local city officials, with varying results. For the sake of space, the details of that litigation will not be discussed here.

termined in administrative proceedings and affirmed by the Court of Appeals." *Id.*

The court concluded that the findings that Idant violated State regulations were entitled to preclusive effect, and that "[a]s to Plaintiffs' claims that they were the target of a 'regulatory conspiracy' among State and Municipal Employees to harass Idant and put it out of business, both the Court of Appeals and an Administrative Law Judge expressly found no evidence of bias or a conspiracy against Idant. These decisions are also entitled to preclusive effect." *Id.* at 1998 WL 108023, *6, 1998 U.S. Dist. LEXIS 2819, *17. The court also held that "there can be no § 1983 claims because Plaintiffs are precluded from alleging a constitutional violation." *Id.* at 1998 WL 108023, *6, 1998 U.S. Dist. LEXIS 2819, *18 (citing *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

Although each case is *sui generis,* I agree with the *Daxor* court's analysis, and find it applicable here as well. As in *Daxor,* the central issues in this case-whether Beechwood was in compliance with applicable statutes and regulations, and whether the charges against them were brought due to improper motives-were necessarily litigated and decided in the state administrative proceedings.

I also note that the *Daxor* court, rejecting the plaintiffs' contention that the State defendants acted as both "accusers and judges," stated that although "[p]reliminary determinations concerning licensing may indeed be made by the Department of Health after investigation, ... Plaintiffs had-and fully exercised-their right to appeal that decision to the New York State courts." *Id.* at 1998 WL 108023, *6, 1998 U.S. Dist. LEXIS 2819, *16. In the case at bar, of course, plaintiffs also had a right to seek redress in the New York State courts, but deliberately chose *not* to. That

is no reason not give prelusive effect to the ALJ's findings. A party should not be allowed to make a conscious decision not to fully litigate an issue in an available forum, and then argue, in a different, later forum, that the party was not given a full and fair opportunity to litigate that issue in the first forum.

## B. Plaintiffs' Claims: The Merits

My conclusion that the administrative findings should be given preclusive effect in the case at bar, means that some, if not most of plaintiffs' claims must fail. For example, their First Amendment retaliation claim, which alleges that defendants' actions against Beechwood were motivated by a desire to punish plaintiffs for having exercised their right to free speech, is undercut by the DOH ALJ's express finding that there was no conspiracy against plaintiffs.

As noted earlier, though, some of plaintiffs' claims do, arguably at least, arise out of events that occurred after the DOH hearing. For instance, plaintiffs' procedural due process claim arises out of DOH's alleged annulment of the facility's establishment approval, which allegedly occurred after plaintiffs' operating certificate was revoked. The Court will, then, address each of plaintiffs' claims on the merits, but bearing in mind that at least some of plaintiffs' allegations are foreclosed by the DOH ALJ's decision.

## 1. Procedural Due Process Claim

■ In their first cause of action, plaintiffs contend that DOH denied plaintiffs their right to procedural due process by annulling Beechwood's establishment approval without notice or a hearing. In addition to defendants' motion for summary judgment, plaintiffs have cross-moved for summary judgment on this claim on the issue of liability only.

Plaintiffs state that the DOH's December 23, 1999 order adopting the ALJ's report and recommendations meant that plaintiffs could no longer operate Beechwood. But, plaintiffs add, the DOH defendants were not satisfied; they would settle for nothing less than plaintiffs' complete financial ruin. Therefore, according to plaintiffs, defendant Greenberg saw to it that not only were plaintiffs prevented from *operating* the facility, but also from selling or leasing the facility to someone who *was* qualified to operate it.

In a letter to Greenberg dated January 6, 2000, plaintiffs' counsel asked him:

> Assuming an otherwise qualified third party buyer/operator (i.e. one who is already successfully operating other facilities in New York under DOH license), what, if any, conditions do the DOH, Commissioner and/or Public Health Council impose on the transfer and sale to such third party by the Chambery partnership of the facility (i.e., the building, equipment and real property) and the associated certificate of need/establishment approval?

Plaintiffs' App. vol. II at M002684.

In a February 2, 2000 letter, Greenberg responded:

> Initially, it should be noted that since the operating certificate of Beechwood has been revoked and the facility closed, Beechwood no longer is considered an existing resource of residential health care facility ("RHCF") beds and there is no "certificate of need or establishment approval" to be transferred.

*Id.* at M002049.

Greenberg added that "any potential buyer wishing to use [the land, building and equipment at the facility] in order to operate a RHCF on the site would be required to submit a certificate of need ('CON') establishment/construction application . . . ." *Id.* Greenberg cautioned, though, that plaintiffs should first contact a particular DOH official "to discuss whether the Department believes there is a need for additional RHCF beds in Monroe County. It is my understanding that, in general, the Department is not reviewing and acting on new CON applications for additional RHCF beds in the state at this time." *Id.* at M002050.

■ According to plaintiffs, this effectively prevented them from selling Beechwood to a new operator. Plaintiffs assert that this deprived them of a property interest without due process of law. Plaintiffs also contend that Greenberg's action violated § 2801–a(10)(b)(i) of New York's Public Health Law, which provides that "[n]o approval of establishment shall be revoked, limited or annulled without first offering the person who received such approval the opportunity to request a public hearing."

Plaintiffs' position, however, is based on a selective view of the facts and a misinterpretation of the law. First, the simple fact is that plaintiffs did close the facility in July 1999. Plaintiffs insist that they did not do so "voluntarily," because, after the Medicare/Medicaid residents left, plaintiffs could no longer afford to operate Beechwood. Regardless of what plaintiffs' reasons for closing Beechwood were, though, the fact remains that they did close it in July. Greenberg, then, was correct in his February 2, 2000 letter when he stated that Beechwood was not, at that time, considered "an existing resource of residential health care facility ('RHCF') beds," and that there was, in effect, nothing (other than the property itself) to transfer.

Plaintiffs' contention that Greenberg's actions violated § 2801 of the Public Health Law is incorrect. First, § 2801–a(10)(b)(i) is not applicable here. DOH did not revoke the facility's establishment approval; the facility had been closed for months. In that situation, to reopen the

facility under new ownership would indeed have required the prospective new operator to obtain a certificate of need.

Section 2801–a(4)(1) provides in part that "[a]ny change in the person who is the operator of a hospital shall be approved by the public health council in accordance with the provisions of subdivisions two and three of this section." Subdivision (2) provides in part that "[w]ith respect to the incorporation or establishment of any hospital, as defined in this article, the public health council shall give written approval after [certain] requirements have been met." Among those requirements are the submission of an application for approval of the establishment with the public health council, and the public health council's approval of the application. Subdivision (3) also provides in part that "[t]he public health council shall not approve a certificate of incorporation, articles of organization or application for establishment unless it is satisfied, insofar as applicable, as to ... the public need for the existence of the institution at the time and place and under the circumstances proposed ...."

Clearly, then, where a facility has ceased operations, a new owner cannot simply walk in and reopen the facility. If Beechwood had lain dormant and empty for twenty years, but plaintiffs had retained ownership of the property, it would be absurd to think that they or anyone else could decide to reopen it without going through the approval process set forth in § 2801–a(4). Part of that process is the receipt of a determination by the public health council that there is a public need for the facility. Whether Beechwood had been closed for twenty years or six

months, however, the fact remained that it *was* closed, and its former residents had gone elsewhere. To reopen it would functionally have been the same as opening a completely new facility. Therefore, § 2801–a(10)(b)(i)'s requirement of a hearing before an establishment's approval is revoked has no application here, and Greenberg correctly informed plaintiffs' counsel that a prospective new owner-operator would have to apply for a certificate of need under § 2801–a(4).[18]

Plaintiffs' procedural due process claim therefore fails. Plaintiffs received all the process that was due them in the state administrative process that led to the revocation of their operating certificate. No further process was due with respect to Beechwood's establishment approval, since that approval was never actually revoked or annulled in the first place.

## 2. First Amendment Retaliation Claim

■ Plaintiffs' second cause of action, alleging that defendants conspired together to retaliate against plaintiffs in retaliation for plaintiffs' having exercised their rights under the First Amendment, is largely foreclosed by the DOH ALJ's factual findings. The ALJ found "Beechwood's claims of a conspiracy against it and/or Mr. Chambery to be a total, complete, and ridiculous fabrication without a shred of evidence or support," and that "there [wa]s nothing in the record which indicate[d] to [the ALJ] that the actions taken and/or conduct of [DOH] was motivated by or taken in retaliation for Brook Chambery's exercise of any of his rights." For the reasons already given, those findings are given preclusive effect here.

---

18. There are also allegations in the complaint regarding defendants' alleged refusal in 1999 to allow plaintiffs to sell or transfer their operating certificate or establishment approval unless they agreed to certain conditions. Complaint ¶¶ 260–64. While it is not clear precisely which cause or causes of action these allegations relate to, they are mentioned in the equal protection claim, *see* Complaint ¶ 290(g), so they are discussed in Part IV of this Decision and Order, *infra*.

■ In addition, although some of plaintiffs' claims do arise out of events that took place after the hearing, there is no evidence that defendants entered into a conspiracy, or that they took retaliatory actions, after the DOH hearing ended. Defendants' conduct here was objectively reasonable, and plaintiffs have not provided sufficient evidence to create an issue of fact about whether defendants acted out of retaliatory motives.

There is some evidence that some of the defendants: made statements referring to Chambery as "notorious" and "infamous," Plaintiffs' App. vol. II, at M005417, 005425; expressed their intent not to "give in at all" with respect to DOH's allegations against Beechwood, *id.* at M005002; and, after learning that Beechwood had been terminated from the Medicare/Medicaid program, sent emails to each other stating, "AMEN & HALLELUJAH" and similar sentiments, *id.* at M005450. All of these statements, though, are entirely consistent with defendants' stated desire to enforce federal and state statutes and regulations governing the operation of nursing homes and to ensure that the health and safety of Beechwood's residents was not being jeopardized. If defendants' statements at times seem to express frustration with Chambery, it does not appear to have been because he had exercised his First Amendment rights, but because defendants perceived him as obstructionist and uncooperative in their efforts to determine whether there were deficiencies at Beechwood. *See id.* at M005417 (email from defendant Rubin complaining that Chambery "consistently harrasses [sic] our surveillance staff ... tries to intimidate them, humiliate them ....")

I realize the Court's obligation, on a motion for summary judgment, to view the record in the light most favorable to the nonmoving parties, and to draw all inferences in their favor. As the Second Circuit has observed, however, "[n]ursing homes are a highly regulated industry, and some tension between operators of homes and regulators is to be expected ...." *Blue v. Koren,* 72 F.3d 1075, 1085 (2d Cir.1995). Given DOH's inspections and investigation of Beechwood, as well as its allegations of deficiencies there (which were ultimately determined in both state and federal administrative proceedings to have merit), it is hardly surprising that there was "some tension" between plaintiffs and defendants, and that defendants gave voice to that tension on occasion. In my view, that is not enough to give rise to an issue of fact about defendants' allegedly retaliatory motives.

### 3. Equal Protection Claim

Plaintiffs also allege that by singling out plaintiffs for investigation and revocation of their operator's license, defendants denied them their constitutional right to equal protection under the law. In effect, then, this claim is one of selective enforcement or prosecution.[19]

■ The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "The requirements for a selective-prosecution claim draw on 'ordinary equal protection standards.'" *United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480,

---

19. Since defendants were involved both in the investigation of Beechwood and the bringing of administrative charges against it, there are elements of both selective enforcement and selective prosecution here. The same analysis governs both types of claims, however. *See United States v. Barlow,* 310 F.3d 1007, 1010 (7th Cir.2002), *cert. denied,* 538 U.S. 1066, 123 S.Ct. 2236, 155 L.Ed.2d 1123 (2003).

134 L.Ed.2d 687 (1996) (quoting *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)).

"[M]ere selective enforcement of a law is not unconstitutional . . . ." *Durruthy v. Pastor,* 351 F.3d 1080, 1091 (11th Cir.2003); *see also Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962) (conscious exercise of selectivity in enforcement not itself an equal protection violation unless "selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification"); *United States v. Matter,* 818 F.2d 653, 655 (8th Cir.1987) ("The mere conscious exercise of some selectivity in enforcement does not in itself create a federal constitutional violation"); *United States v. Lichenstein,* 610 F.2d 1272, 1281 (5th Cir.) ("selective enforcement in and of itself is not a constitutional violation"), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980). Rather, "[i]n order to establish a violation of equal protection based on selective enforcement, the plaintiff must ordinarily show (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Lisa's Party City, Inc. v. Town of Henrietta,* 185 F.3d 12, 16 (2d Cir.1999) (quotes and citations omitted). "A plaintiff generally must satisfy both elements to establish a claim of selective enforcement . . . ." *La-Trieste Restaurant v. Village of Port Chester,* 188 F.3d 65, 70 (2d Cir.1999) (citing *Zahra v. Town of Southold,* 48 F.3d 674, 684 (2d Cir.1995), *cert. denied,* 528 U.S.

1187, 120 S.Ct. 1240, 146 L.Ed.2d 99 (2000)).

Plaintiffs have failed to make out either element. First, they have failed to show that they were treated differently from other similarly situated individuals. In attempting to make this showing, plaintiffs argue that Beechwood was in fact one of the best nursing homes in the state, if not the nation. Regardless of plaintiffs' subjective opinion in that regard, however, and regardless of what others may have thought of Beechwood, or what its reputation might have been at a certain time or among certain people, both the DOH and federal ALJs found, after lengthy hearings, that there were significant deficiencies at Beechwood. Likewise, while plaintiffs may be correct in their assertion that Beechwood did not have a lengthy history of above-average numbers of deficiencies, the actions taken against plaintiffs were not on account of deficiencies or other problems from many years earlier, but deficiencies that were found in the 1999 surveys.

Plaintiffs also contend that termination of a facility from the Medicare/Medicaid program is a harsh, rarely-used sanction, that the DOH hearing was "unusual and extraordinary," Plaintiffs' Memorandum of Law at 32, and that the DOH administrative proceedings were carried out on an accelerated time frame. Aside from the fact that these assertions are based largely on Chambery's own conclusory allegations, the fact that a particular action or event is relatively rare, without more, is not enough to satisfy the first prong of a selective enforcement claim. Certain sanctions may rarely be imposed because there is rarely any reason *to* impose them. Again, plaintiffs must show that they were treated differently from other similarly situated individuals, and they have not done so.[20] *See King v.*

---

20. Furthermore, even if plaintiffs could identify similarly situated nursing homes, with deficiencies at least as serious as those at Beechwood, against whom DOH had not taken action, that would not be enough, since "[m]ere failure to prosecute other offenders is not a basis for a finding of denial of equal

*Haas,* No. C2–00–1411, slip op. at 39–40 (S.D.Ohio Sept. 4, 2002) (granting summary judgment in favor of defendant state health official on plaintiff's claim that his nursing homes were subjected to unusually large and comprehensive surveys in retaliation for plaintiff's having publicly criticized many proposed regulations of which defendant was a proponent, where plaintiff presented no evidence that other similarly situated nursing homes were not subjected to the surveys), *aff'd for reasons stated by district court,* 85 Fed.Appx. 480, 2004 WL 74649 (6th Cir.2004).

■ Plaintiffs also attempt to show that they were treated in a selective manner when they sought approval for the sale of Beechwood to another licensed operator in the Summer and Fall of 1999.[21] At some point during the summer, the parties apparently began discussing settlement of the proceedings against Beechwood, as part of which plaintiffs would agree to sell the facility to a new owner. Chambery states that he had a prospective buyer, Robert Chur, who owned a company that operated several similar facilities in New York State.

DOH indicated to plaintiffs that, subject to certain conditions, it would agree to settle the matter and temporarily suspend (rather than revoke) plaintiffs' operating certificate to allow them a "reasonable opportunity to sell and transfer ownership of the operation and real property of the Beechwood facility to a new owner and operator duly established and licensed under the Public Health Law." Plaintiffs' App. vol. II at M002733. Those conditions were that the Chamberys: (1) agree never again to take a management or ownership position in the regulated health care field in New York; (2) surrender their administrator's licenses; (3) release the DOH defendants from any and all claims relating to Beechwood; and (4) pay a civil penalty of $54,000. *Id.* at M002730–37.

■ Again, plaintiffs assert that imposing such conditions on the sale and transfer of a facility is out of the ordinary and evidence of defendants' ill will.[22] Plaintiffs contend that existing nursing homes are "routinely" sold to other licensed operators

protection." *LeClair v. Saunders,* 627 F.2d 606, 608 (2d Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). Instead, "selective prosecution implies that a selection has taken place." *Armstrong,* 517 U.S. at 469, 116 S.Ct. 1480 (internal quotations and alterations omitted). Therefore, "[a]bsent a showing that [defendants] knew of other violations, but declined to prosecute them, [Beechwood] would ordinarily be unable to show that it was treated selectively." *LaTrieste Restaurant,* 188 F.3d at 70.

21. The complaint refers to DOH's refusal to allow plaintiffs "to sell or transfer the operating certificate or the establishment approval" for Beechwood, Complaint ¶ 261, but it is apparent from the evidence that what the parties actually discussed beginning in the Summer of 1999 was the sale and transfer of "ownership of the operation and real property" of the facility to a new, licensed owner. Plaintiff's App. vol. II at M002733.

22. The Second Circuit has not yet decided whether the Supreme Court's decision in *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam) removed the requirement that an illicit motivation be shown to establish a valid "class of one" equal protection claim. *See DeMuria v. Hawkes,* 328 F.3d 704, 707 n. 2 (2d Cir.2003); *Giordano v. City of New York,* 274 F.3d 740, 751 (2d Cir.2001); *Harlen Associates v. Incorporated Village of Mineola,* 273 F.3d 494, 500 (2d Cir.2001). The court has made clear, though, that even if malice or bad faith need not be shown, a plaintiff would at least be required to show that the challenged action was "irrational and wholly arbitrary," in other words, that there was "no legitimate reason for [the defendants'] decision." *Harlen Assocs.,* 273 F.3d at 500. Plaintiffs have failed to make such a showing here, as explained in the body of this Decision and Order.

with DOH approval without such conditions being imposed.

The situation here, though, was anything but "routine." This was not simply a proposed sale by an owner-operator who was retiring or moving out of the state, for example. The circumstances here were that DOH had charged Beechwood with serious deficiencies, which DOH believed were attributable in large part to the Chamberys themselves, whom DOH apparently considered to be poor nursing home administrators. It was not irrational, then, for DOH to seek an agreement that the Chamberys never again participate in the operation of a nursing facility. In addition, plaintiffs had filed the *Beechwood I* action in June 1999, and given what was by then the poisoned relationship between plaintiffs and defendants, it was hardly remarkable that, in proposing a "global" settlement, defendants insist that plaintiffs release them from any claims stemming from the proceedings against Beechwood.

■ I find, then, that plaintiffs have failed to make out the second prong on their equal protection claim as well. In reaching that conclusion, I am mindful of the "strong presumption that the state actors have properly discharged their official duties . . . ." *Stemler v. City of Florence,* 126 F.3d 856, 873 (6th Cir.1997), *cert. denied,* 523 U.S. 1118, 118 S.Ct. 1796, 140 L.Ed.2d 936 (1998). "[T]o overcome that presumption the plaintiff must present clear evidence to the contrary; 'the standard is a demanding one.'" *Id.* (quoting *Armstrong,* 517 U.S. at 463, 116 S.Ct. 1480). *See also Gavlak v. Town of Somers,* 267 F.Supp.2d 214, 225 (D.Conn.2003) ("Our determination . . . is tempered by the policy of affording governmental decisions a strong presumption of validity, which directs us to uphold a governmental decision if there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification'") (quoting *Heller v. Doe by Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)).

As the Second Circuit stated in *Blue,* 72 F.3d at 1085, "[t]his was not a case in which regulatory officials scoured a municipal code to find a forgotten provision passed during the Mexican–American War to trip up a gadfly." The record demonstrates that defendants had valid, rational reasons for their actions, and there is no evidence of *any* individuals situated similarly to plaintiffs who were treated differently.

### 4. Abuse of Governmental Power/Substantive Due Process Claim

■ Plaintiffs' fourth cause of action is essentially a catch-all or umbrella claim, alleging that defendants' various acts alleged in the complaint constituted an "abuse of governmental power" and denied plaintiffs their right to substantive due process. Complaint ¶ 295. To some extent, these characterizations of defendants' acts are redundant of each other, since the abusive use of governmental power is what the substantive component of the Due Process Clause is designed to prevent. *See Howard v. Grinage,* 82 F.3d 1343, 1349 (6th Cir.1996); *Pink v. Lester,* 52 F.3d 73, 75 (4th Cir.1995); *Minney v. Kradas,* No. 3:01–CV–1543, 2004 WL 725330, at *4 (D.Conn. Mar. 31, 2004) (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).

■ "Government conduct may be actionable under section 1983 as a substantive due process violation if it 'shocks the conscience.'" *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.) (quoting *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952), *cert. denied,* 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992)). "A substantive due

process claim based on allegedly tortious conduct by a state actor therefore ordinarily requires evidence of conduct that 'can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense.'" *Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133 (2d Cir.1994) (quoting *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *see also Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 400 (3d Cir.) (only the "most egregious official conduct can be said to be 'arbitrary in the constitutional sense'"), *cert. denied,* 531 U.S. 1011, 121 S.Ct. 566, 148 L.Ed.2d 485 (2000)); *Rosa R. v. Connelly,* 889 F.2d 435, 439 (2d Cir.1989) (requiring evidence that official action was "arbitrary or irrational or motivated by bad faith"), *cert. denied,* 496 U.S. 941, 110 S.Ct. 3225, 110 L.Ed.2d 671 (1990); *Chalfy v. Turoff,* 804 F.2d 20, 23 (2d Cir.1986) (requiring proof of "systematic and intentional harassment" to transform official action causing economic injury into a constitutional violation) (per curiam).

Defendants are entitled to summary judgment on this claim as well. As my discussion of their other claims makes clear, I find no basis for plaintiffs' allegations that defendants' conduct was arbitrary, malicious, had no legitimate purpose, and so on. Rather, defendants' conduct was rationally related to the state's legitimate interest in the regulation of nursing homes, and "it can hardly be doubted that the interest is of the highest order." *Blue,* 72 F.3d 1075, 1080 (2d Cir.1995).

## 5. Federal Supremacy Claim

 Plaintiffs assert a claim for what they describe as a "denial of [their] right to federal law supremacy." Complaint ¶ 76. The basis for this claim is plaintiffs' assertion that DOH should not have conducted a hearing until plaintiffs had first had a hearing before HCFA. Although plaintiffs cannot point to any specific statute or regulation prohibiting state regulatory agencies from conducting revocation hearings prior to HCFA hearings, they contend that the "premature" DOH hearing interfered with or tainted the eventual federal administrative proceedings, and that DOH "intruded into an area reserved for HCFA adjudication ...." Plaintiffs' Memorandum of Law at 41.

 An initial problem with this claim is that "the Supremacy Clause, of its own force, does not create rights enforceable under § 1983...." '[T]hat clause is not a source of any federal rights'; it "'secure[s] federal rights by according them priority whenever they come in conflict with state law.'" *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (quoting *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 613, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)). *See also Howard v. Burlingame,* 937 F.2d 1376, 1380 (9th Cir. 1991) ("the supremacy clause merely safeguards federal interests against state infringement, and operates to preempt state regulatory action without creating individual rights").

The problem here is that plaintiffs are not seeking to "secure" any federal rights; they are not seeking injunctive relief, but only money damages. The Court in *Golden State* did hold that the plaintiff in that case, who alleged that the defendant city was preempted by the National Labor Relations Act ("NLRA") from taking certain actions regarding the plaintiff's taxicab franchise, could seek damages in a § 1983 action. Although the Supremacy Clause provided the underlying basis for that preemption, however, the Court made clear that the clause itself was not the source of the plaintiff's rights enforceable under § 1983. Rather, it was the NLRA itself that created those rights. *See Golden*

*State,* 493 U.S. at 108, 110 S.Ct. 444 ("the fact that a federal statute has preempted certain state action does not preclude the possibility that the *same federal statute* may create a federal right for which § 1983 provides a remedy").

In the case at bar, plaintiffs have pointed to no such federal statute. Plaintiffs contend that the Medicare Act "may" supply their basis for standing, *see* Plaintiffs' Memorandum of Law at 76 and n. 76, but they have not identified any particular language in that act that creates the rights alleged to have been violated here. *Cf. Concourse Rehabilitation & Nursing Center, Inc. v. DeBuono,* 179 F.3d 38, 44 (2d Cir.1999) ("we look in vain to find any specific federal provision that appellant cites as conflicting with the State [nursing home] audit practices described above").

Plaintiffs also cite various federal regulations, none of which expressly proscribe "premature" state administrative enforcement proceedings, in an effort to show the federal government's primary role in the Medicare/Medicaid field, but that simply is not enough to give rise to a right enforceable under § 1983.[23] For that matter, I am not persuaded that enforcement of nursing home standards is, as plaintiffs contend, "an area reserved for HCFA adjudication by federal law and regulations ...," Plaintiff's Memorandum of Law at 41. Although nursing homes must comply with certain federally created standards in order to participate in the Medicare/Medicaid program, the states also have significant responsibilities with respect to establishing and maintaining standards to ensure adequate levels of resident care, *see* 42 U.S.C. § 1396a, and primary responsibility for compliance enforcement, *see* 42 U.S.C. § 1395i–3(g)(1)(A). Furthermore, leaving aside Medicare/Medicaid altogether, the state obviously has a strong interest in seeing to it that nursing homes within its borders provide quality care for their residents. *See Blue,* 72 F.3d at 1080 (observing that "it can hardly be doubted" that "the government interest in the state *and* federal regulation of nursing homes ... is of the highest order") (emphasis added).

The case upon which plaintiffs primarily rely, *Sperry v. State of Florida,* 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963), is inapposite. In *Sperry,* the Court held that the State of Florida could not enjoin the petitioner, who was registered to practice before the United States Patent Office, but who had not been admitted to practice law before the Florida or any other bar, from performing certain tasks incident to the preparation and prosecution of patent applications before the Patent Office, on the ground that he was engaged in the unauthorized practice of law. Noting that a federal statute expressly permitted the Commissioner of Patents to au-

---

**23.** Even if plaintiffs had shown a violation of federal regulations (which they have not), it is questionable whether that would suffice. Some courts have held that a regulation, by itself, cannot create a federally enforceable § 1983 right without at least implicit recognition of such right in the regulation's enforcing statute. *See Save Our Valley v. Sound Transit,* 335 F.3d 932, 939 (9th Cir.2003); *South Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.,* 274 F.3d 771, 784 (3d Cir.2001), *cert. denied,* 506 U.S. 819 (2002); *Harris v. James,* 127 F.3d 993, 1008 (11th Cir.1997); *Smith v. Kirk,* 821 F.2d 980, 984 (4th Cir.1987). Other courts have held that a regulation can itself provide for an enforceable federal right. *See Loschiavo v. City of Dearborn,* 33 F.3d 548 (6th Cir.1994), *cert. denied,* 513 U.S. 1150, 115 S.Ct. 1099, 130 L.Ed.2d 1067 (1995); *Samuels v. Dist. of Columbia,* 770 F.2d 184 (D.C.Cir.1985). The Second Circuit has yet to weigh in on this issue. *See King v. Town of Hempstead,* 161 F.3d 112, 115 (2d Cir.1998) (declining to endorse either view). Since plaintiffs have not presented evidence that the timing of the DOH proceedings did violate federal regulations, it is unnecessary for the Court to decide that issue.

thorize practice before the Patent Office by nonlawyers, the Court stated that "by virtue of the Supremacy Clause, Florida may not deny to those failing to meet its own qualifications the right to perform the functions within the scope of the federal authority." *Id.* at 385, 83 S.Ct. 1322.

The situation in *Sperry*, then, was far different from the one presented in the case at bar. In *Sperry*, the Patent Office-an arm of the federal government-had, pursuant to a federal statute, granted the petitioner the right to appear before that office, and the state in effect sought to prevent him from doing so, on state law grounds. In contrast, plaintiffs here, who seek only money damages, have pointed to no specific federal right or federally-granted benefit or privilege which was denied them or interfered with by the DOH defendants. Plaintiffs had a right to a hearing before HCFA, but they *were* given such a hearing. Their vague, amorphous theory that DOH somehow interfered with the federal administrative process, or intruded into an area reserved for the federal authorities, by holding a "premature" hearing of its own, finds no support in the applicable statutes, regulations, or case law.

### 6. *Bivens* Claims

Plaintiffs' final claim, brought only against defendants Sue Kelly and Michael Daniel ("the federal defendants"), alleges that they conspired together and, acting under color of federal law, denied plaintiffs their rights under federal law and under Article VI and the First and Fifteenth Amendments of the United States Constitution.

██ In a so-called *Bivens* action, the victim of a constitutional violation may recover damages against federal officials acting under color of federal law. *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir.1994); *see Bivens*, 403

U.S. at 389, 91 S.Ct. 1999. Despite the absence of any statute specifically conferring such a cause of action, "federal courts typically analogize claims under § 1983 with *Bivens* actions." *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir.1995).

Here, the claims asserted against the federal defendants are essentially the same as some of the claims asserted against the DOH defendants. Plaintiffs' claims against the federal defendants are certainly no stronger than those against the DOH defendants; if anything, they are weaker, since the DOH defendants appear to have been the primary actors here. Although there is some evidence that the federal defendants supported DOH's efforts to investigate Beechwood and to bring administrative charges against it, that is unremarkable, given DOH's and HCFA's mutual responsibilities and authority in the area of nursing home regulation.

██ Furthermore, to the extent that plaintiffs assert that the federal defendants conspired with the DOH defendants to drive plaintiffs out of business, plaintiffs' claims against the federal defendants are barred by collateral estoppel. Although the DOH ALJ had no occasion to consider the actions of any federal officials, his finding that there was no conspiracy among the relevant DOH officials and employees means that there was no conspiracy for the federal defendants to join. There is also no evidence that the two federal defendants conspired with each other to retaliate against plaintiffs. *See Romer v. Morgenthau*, 119 F.Supp.2d 346, 363 (S.D.N.Y.2000) ("plaintiff must provide some factual basis supporting a 'meeting of the minds,' such as that defendants 'entered into an agreement ... to achieve the unlawful end' ") (citation omitted).

██ In addition, to the extent that plaintiffs' claims arise out of HCFA's June

1999 termination of Beechwood's Medicare and Medicaid provider agreement, the Medicare Act provides a meaningful remedy, *see* 42 U.S.C. § 405(g), and therefore a *Bivens* claim would be precluded in any event. *See Schweiker v. Chilicky*, 487 U.S. 412, 425–29, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (where Congress has provided what it considers an adequate remedial mechanism for constitutional violations, the courts will not create a Bivens remedy); *see, e.g., Assar v. Crescent Counties Foundation For Medical Care*, 13 F.3d 215, 219 (7th Cir.), *cert. denied*, 513 U.S. 816, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994); *Hilst v. Bowen*, 874 F.2d 725, 727–28 (10th Cir.1989); *Neiman v. Secretary of Dep't of Health and Human Services of the United States*, 722 F.Supp. 950, 953 (E.D.N.Y. 1988).

## C. Qualified Immunity

 Even if any of plaintiffs' claims otherwise had any merit, defendants would be entitled to summary judgment on the ground of qualified immunity, since plaintiffs have failed to show an improper motive on their part. Although, given my findings that plaintiffs' claims are meritless and barred by collateral estoppel, it is unnecessary to reach the issue of qualified immunity, I discuss it only to make clear that defendants are entitled to summary judgment on this ground as well. *See Duamutef v. Hollins*, 297 F.3d 108, 113 n. 1 (2d Cir.2002) ("once we decide that there is no constitutional violation, there typically is no need to address whether defendants are also protected by qualified immunity-although qualified immunity becomes obvious at that point. In this case, we take the further step of pronouncing the obvious-that qualified immunity exists-to avail defendants of the *Blue* standard to which they are entitled").

 Government officials are shielded from civil liability under 42 U.S.C. § 1983 by the doctrine of qualified immunity so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To be "clearly established," "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

In *Blue v. Koren*, a case with facts similar to those in the case at bar, the Court of Appeals for the Second Circuit reversed the district court's denial of a motion for summary judgment brought by the defendants, all of whom were current or former DOH employees. The plaintiff, a nursing home operator, alleged that the defendants had engaged in "oppressive" surveys of the nursing home in retaliation for DOH's loss in a prior enforcement action against the nursing home.

In its decision, the Second Circuit held that in order to defeat the defendants' motion, the plaintiff was required to "offer specific evidence of improper motivation," and to "proffer particularized evidence of direct or circumstantial facts ... supporting the claim of an improper motive in order to avoid summary judgment." 72 F.3d at 1083–84. In so holding, the court observed that "[t]he reasonableness of the [defendants'] conduct is itself substantial evidence in support of the motion and requires in response a particularized proffer of evidence of unconstitutional motive." *Id.* at 1084.

The court found such evidence lacking in *Blue*. Although there was evidence of an acrimonious relationship between the nursing home and the DOH in that case, the Second Circuit noted that

[n]ursing homes are a highly regulated industry, and some tension between op-

erators of homes and regulators is to be expected, as are occasional adversary proceedings. We do not believe that a showing that a rigorous inspection followed a nursing home's victory in an administrative proceeding is a sufficiently particularized showing of improper motive. While such a temporal sequence may fuel a nursing home operator's suspicions, it does not suffice to satisfy the heightened evidentiary standard.[24]

*Id.* at 1085.

Similarly, plaintiffs in the case at bar have not proffered particularized evidence of improper intent on the part of defendants to defeat defendants' well-founded motions for summary judgment. Plaintiffs' opposition to defendants' assertion of qualified immunity is based largely on plaintiffs' allegations of defendants' improper and unconstitutional actions, which I have already found lacking or barred by collateral estoppel.

 In addition, as in *Blue*, plaintiffs here rely in part on the sequence of events in support of their claim of improper motivation. Specifically, plaintiffs contend that the increase in the frequency and severity of deficiency findings began after Chambery began complaining to and about DOH and its practices. As the Second Circuit stated in *Blue*, this may have fueled Chambery's suspicions, but it is insufficient evidence of improper motive to defeat a motion for summary judgment. Furthermore, the DOH ALJ's findings indicate that Chambery's complaints about DOH were to some extent the *result*, not the cause, of DOH's inspections of Beechwood. As he put it, Chambery's usual response to DOH's deficiency findings was not to correct the problem, but to engage in "combat" with DOH.[25]

### D. Plaintiffs' Discovery Request

 As part of their opposition to defendants' motions, plaintiffs contend that, although they believe that they have presented sufficient evidence to defeat defendants' motions, if the Court decides otherwise, then plaintiffs should be allowed discovery pursuant to Rule 56(f).[26] This

---

**24.** The court in *Blue* noted that "[w]here ... a constitutional claim contains a subjective component, many courts have imposed on plaintiffs what they describe as a heightened standard, requiring them to provide specific allegations or direct evidence of the required state of mind in order to avoid summary judgment based on the defense of qualified immunity." 72 F.3d at 1082–83. Though agreeing with that principle, the Second Circuit "confess[ed] considerable doubt as to whether the 'heightened' standard is really heightened or is simply an application of the rule that conclusory assertions are insufficient to defeat a motion for summary judgment." *Id.* at 1083–84.

**25.** In addition to the grounds upon which I have found that defendants are entitled to summary judgment, defendants have raised several additional grounds as well. The federal defendants, for example, contend that plaintiffs have not exhausted their administrative remedies under the Medicare Act, which

provides that judicial review is available only of a "final decision" of the Secretary of Health and Human Services. 42 U.S.C. § 405(g). It appears, however, that the DAB's January 23, 2004 decision constitutes such a final decision.

The DOH defendants also argue that the Court should "abstain" from exercising its jurisdiction in this action. Since there are no pending state proceedings at this time (aside from the moribund Article 78 proceeding), I see no basis for abstention.

Four of the seventeen DOH defendants also assert absolute immunity, based on their performance of allegedly quasi-judicial or -prosecutorial acts. My finding that all the defendants are entitled to qualified immunity renders it unnecessary for me to reach this issue, and I decline to do so.

**26.** Rule 56(f) provides that

[s]hould it appear from the affidavits of a party opposing the [summary judgment]

request must be denied, for several reasons.

First, in a Case Management Order entered on December 17, 2002 by then-Magistrate Judge William G. Bauer, upon the filing of any pre-discovery dispositive motions on or before February 1, 2003, plaintiffs' counsel was given until February 28, 2003 "to confer with counsel for the defendants in an effort to reach an agreement regarding tailored discovery related to plaintiffs' opposition to the motions." Docket # 42, ¶ 3. If the parties were unable to reach such an agreement, they were directed to contact the Court on or before February 28 to schedule a conference "to resolve any disagreements concerning the proper scope of plaintiffs' request for discovery related to their opposition to the motions." *Id.* ¶ 4. If the Court determined at that conference "that a formal Rule 56(f) application was necessary in order to resolve the discovery scope issue, the Court [would] issue a scheduling order for the filing of such an application." *Id.* ¶ 5.

Plaintiffs have ignored this directive. Instead of attempting to reach an agreement on discovery with defendants, or contacting the Court to schedule a conference to address that issue, plaintiffs simply contend that, if the Court finds that they have not proffered enough evidence to overcome defendants' motions, the Court should deny the motions and allow plaintiffs to proceed with discovery. That is not what

Magistrate Judge Bauer's order directed them to do.

Secondly, plaintiffs have not made a sufficient showing under Rule 56(f), which requires them to submit an affidavit describing: (1) the information sought and how it will be obtained; (2) how it is reasonably expected to raise a genuine issue of material fact; (3) prior efforts to obtain the information; and (4) why those efforts failed. *Oneida Indian Nation v. City of Sherrill,* 337 F.3d 139, 167 (2d Cir.2003), *petition for cert. filed,* 72 U.S.L.W. 3421 (Dec. 11, 2003) (No. 03–85). All that plaintiffs have submitted in this regard is Chambery's affidavit, in which he identifies certain individuals whom plaintiffs would seek to depose. Chambery also cites a number of paragraphs from plaintiffs' Rule 56.1 Statement in which plaintiffs state that they lack knowledge or information sufficient to admit or deny certain assertions made in defendants' Rule 56.1 Statements. *See* Chambery Aff. ¶¶ 194–95.

This is insufficient under Rule 56(f).[27] Chambery does not state exactly what evidence plaintiffs seek, what efforts have been made to obtain it, or how that evidence can reasonably be expected to raise a genuine issue of material fact. "While 'Rule 56(f) discovery is specifically designed to enable a plaintiff to fill material evidentiary gaps in its case ... it does not permit a plaintiff to engage in a "fishing expedition." ' " *Paddington Partners v.*

motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

27. I also note that Chambery states in his affidavit that, although he "believe[s] that

plaintiffs have set forth sufficient facts to overcome defendants' pre-discovery motions for summary judgment," if the Court disagrees, then plaintiffs "alternatively argue that additional facts essential to oppose defendants' motions exist," but plaintiffs are unable to present those facts without discovery. Chambery Aff. ¶ 193. In other words, those (unspecified) facts will only become "essential" if the Court decides that defendants' motions should be granted.

*Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994) (quoting *Capital Imaging Assoc. v. Mohawk Valley Medical Assoc.,* 725 F.Supp. 669, 680 (N.D.N.Y.1989), *aff'd,* 996 F.2d 537 (2d Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993)).

 Furthermore, although it is technically correct that there has been no formal discovery in *this* action, in a broader sense to say that plaintiffs have not had any discovery is somewhat disingenuous. Plaintiffs' appendix submitted in connection with the pending motions, consisting of various affidavits and other documents, is some four inches thick, and as stated, the parties here have already been through considerable administrative proceedings. Plaintiffs do not appear to deny defendants' assertion that, both in the DOH administrative proceedings and in response to plaintiffs' requests under the New York Freedom of Information Law ("FOIL"), DOH produced well over 1000 pages of documents relating to DOH policies and procedures and its surveys of Beechwood. *See* Reply Affidavit of Harold J. Rosenthal (Docket # 83), ¶ 3.

Many of the facts relating to DOH's production of documents in response to plaintiffs' FOIL requests are summarized in a decision by state Supreme Court Justice Evelyn Frazee (Rosenthal Reply Aff. Ex. C), denying Beechwood's and Chambery's ("petitioners") application for attorney's fees in connection with their FOIL requests. Justice Frazee stated that between August 1999 and February 2001, "petitioners submitted 17 different FOIL requests" to DOH, each of which "contained numerous demands." *Id.* at 2. In response, DOH turned over 600 pages of documents, as well as another box of unsorted documents.[28]

In April 2001, petitioners commenced an Article 78 proceeding before Justice Frazee, alleging that DOH had not been responsive to twelve of their seventeen requests. In June 2001, DOH produced an additional 350 responsive documents. After further searching, DOH identified another 392 responsive documents in December 2001. *Id.* at 3. On June 20, 2002, Justice Frazee denied petitioners' request for still more documents, finding that certain documents were exempt and that no further response was required in regard to another.[29]

Clearly, then, plaintiffs are already in possession of a vast number of documents relating to the issues in this case. Chambery's conclusory assertion that "some facts are still exclusively in the control of the defendants," Chambery Aff. ¶ 193, is not enough to meet plaintiffs' burden of showing that they need discovery in order to oppose defendants' motions. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993) (party seeking a continuance under Rule 56(f) to permit affidavits to be obtained or discovery to be

---

**28.** Rosenthal, an attorney with DOH, states that since February 2001, plaintiffs have submitted an additional 18 FOIL requests. Rosenthal Reply Aff. ¶ 13.

**29.** In denying the motion for fees, Justice Frazee stated that although Beechwood was arguably a "prevailing party" in the sense that it "obtained hundreds of pages or responsive papers as a result of its Article 78 proceeding ...," DOH had prevailed on every claimed exemption to other documents. *Id.* at 5. She also noted that "many of the docu-

ments provided were already in the petitioners' possession or consisted of documents which were readily available to the public. Moreover, petitioners requested many documents that did not exist." *Id.* Justice Frazee added that many of the documents sought by Beechwood were not of significant interest to the general public, as was evidenced by counsel's time records "which indicate[d] that the petitioners were seeking to obtain documents for use in the federal civil rights action which petitioners eventually filed against employees of the NYSDOH." *Id.*

had "may not rely simply on conclusory statements"); *accord L & L Started Pullets, Inc. v. Gourdine,* 762 F.2d 1, 3–4 (2d Cir.1985); *see also Agency Development, Inc. v. Med America Ins. Co.,* 310 F.Supp.2d 538, 548–49 (W.D.N.Y.2004) ("plaintiff's conclusory discovery request is not sufficient to withstand summary judgment").

### III. CONCLUSION

Defendants' motions for summary judgment (Docket # 43, # 49 and # 59) are granted, and the complaint is dismissed.

Plaintiffs' cross-motion for partial summary judgment (Docket # 68) is denied.

IT IS SO ORDERED.